1  ROBERT F. KANE, ESQ. (State Bar No. 71407)
   LAW OFFICES OF ROBERT F. KANE
2  870 Market Street, Suite 1128
   San Francisco, CA 94102
3  (415) 982-1510; Fax (415) 982-5821
   rkane1089@aol.com

4  JAMES L. FELDESMAN, ESQ
5  MATTHEW S. FREEDUS, ESQ.
   MARISA B. GUEVARA, ESQ.
6  FELDESMAN TUCKER LEIFER FIDELL LLP
   1129 20th Street, N.W., Fourth Floor
7  Washington, D.C. 20036
   Tel.: (202) 466-8960; Fax: (202) 293-8103
8  jfeldesman@feldesmantucker.com
9  mfreedus@feldesmantucker.com
   mguevara@feldesmantucker.com
10

11 *Attorneys for North East Medical Services, Inc.*

FILED

2012 JUN -4 P 3:25

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

12              **UNITED STATES DISTRICT COURT**

13      **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO**

JCS

14

15

16  NORTHEAST MEDICAL SERVICES,       CV NO. **12  2895**
    INC.
17
                    *Plaintiff,*           **COMPLAINT FOR DECLARATORY
18                                          AND INJUNCTIVE RELIEF**
                       v.
19
20  CALIFORNIA DEPARTMENT OF
    HEALTH CARE SERVICES, HEALTH
21  AND HUMAN SERVICES AGENCY,
    STATE OF CALIFORNIA; TOBY
22  DOUGLAS, DIRECTOR OF THE
    DEPARTMENT OF HEALTH CARE
23  SERVICES, STATE OF CALIFORNIA;
    STATE OF CALIFORNIA; THE UNITED
24  STATES DEPARTMENT OF HEALTH
    AND HUMAN SERVICES; KATHLEEN
25  SEBELIUS, SECRETARY OF THE
    UNITED STATES DEPARTMENT OF
26  HEALTH AND HUMAN SERVICES;
27
                    *Defendants.*
28

ORIGINAL

1

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.    Plaintiff North East Medical Services, Inc. ("NEMS") is a "health center" receiving federal grant funds under Section 330 of the Public Health Service ("PHS") Act.

2.    Federal Medicaid law ("Medicaid Act") authorizes Section 330 health centers such as NEMS to play two roles in making available services to which beneficiaries of the Medicaid program are entitled: (1) provider of health care services that Medicaid either fully or largely pays physicians, hospitals, clinics, *etc.*, to deliver; and (2) risk-bearing health maintenance organization ("HMO") or managed care organization or "MCO" (which the Medicaid Act defines as the principal entity eligible to be a managed care contractor and includes HMOs, among others), in which case the center becomes responsible not just for the care that its medical staff provides, but all care – hospital, specialty, *etc.* – needed by Medicaid beneficiaries (for whose care such entities are responsible).

3.    With respect to a Section 330 health center playing the role of health care service provider, the Medicaid Act requires each State Medicaid program to pay the center a special amount premised on the cost of the services that the center provides (largely primary care and related services). That amount is paid either directly by the State or, if the State program has adopted "managed care" to provide Medicaid services (and such services include those of Section 330 health centers), MCOs and like entities must pay at least a part of the center's special payment.

4.    In particular, when such an entity uses the Section 330 health center to provide services, the entity is required by the Medicaid Act to pay the center "not less than" what it pays other providers for the same service. 42 U.S.C. § 1396b(m)(2)(A)(ix) (referred to herein as "clause (ix)"). That requirement is not just stated in the Medicaid Act. Clause (ix) refers to what must be repeated as a term or condition of all Medicaid managed care contracts as a prerequisite to the federal government's prior approval of such contracts under 42 U.S.C. § 1396b(m)(2)(A).

5.    Under a separate provision of the Medicaid Act, 42 U.S.C. § 1396a(bb)(5), the actual payments to Section 330 health centers (for any or all of the "ambulatory" services they provide) made by such Medicaid managed care contractors (principally MCOs) act as an offset to

1   the State Medicaid program's obligation to make the special payment to health centers. Although
2   § 1396a(bb)(5) contemplates the possibility that the contractor's payment may be equal to a
3   health center's special payment amount, the reality is that the clause (ix) requirement of "not less
4   than" is seldom as much as that amout. Regardless of why the MCO payments are less than the
5   center's special payment, § 1396a(bb)(5) requires the State Medicaid program to pay the center
6   the difference.

7       6.     The same clause (ix) requirement applies when the managed care contractor is a
8   Section 330 health center. That is, when the health center operates in the manner of an MCO *and*
9   a care provider, the center (in its MCO role) must pay itself (as care provider) for the basic
10  services it provides in amounts "not less than" the amount it pays other providers for the same
11  service or services. If that "not less than" amount is less than the center's special payment, the
12  State must pay the difference.

13      7.     The capitation (*i.e.*, the fixed per-member per-month sum) that the center receives,
14  for its role as MCO, covers much more than the primary and other services performed by the
15  Section 330 health center in its (other) role of care provider. Furthermore, the capitation itself
16  should be designed to cover only the amounts MCOs are required to pay providers of care (plus
17  reasonable administration costs and possibly profits). For Section 330 health centers, it would be
18  the "not less than" amount.

19                          **The Investigation**

20      8.     In or about May 2011, an Assistant United States Attorney ("AUSA") from the
21  Office of the United States Attorney for the Northern District of California issued a Civil
22  Investigative Demand ("CID") to NEMS to "determine whether there is or has been a violation of
23  31 U.S.C. § 3729" and investigate "allegations that [NEMS] submitted false or fraudulent
24  information to federal government healthcare programs." An agent from the U.S. Department of
25  Health and Human Services ("HHS"), Office of Inspector General ("OIG"), who is and has been
26  working on this matter in concert with the AUSA, personally served the CID on an officer of
27  NEMS.

28

1       9.     Between the CID and initial discussions with the AUSA, it became clear that the investigation was concerned with the Medicaid capitated risk contract NEMS has received from the San Francisco Public Health Authority (operating as San Francisco Health Plan ("SFHP")), which has a Medicaid MCO contract from the State. It likewise became clear that the focus of the investigation was on what NEMS pays itself under that contract (or, in other words, whether NEMS' payments to itself are proper for the purposes of its claims for State owed payments still needed to meet the State's special payment obligation).

       10.    What led to this lawsuit was an outgrowth of the investigation – *i.e.*, an April 9, 2012 letter sent by the AUSA, acting in concert with and on behalf of HHS and the State of California (with respect to the State's Medicaid program), to NEMS' counsel. The AUSA's letter purported to give unequivocal and authoritative interpretations of statutory provisions of the Medicaid Act and provisions and regulations under that Act that have a direct, immediate, and harmful effect on NEMS' ongoing operations and continuing interests. In particular, the AUSA asserted that the "not less than" clause (ix) payment rule is either *in*applicable to NEMS' SFHP contract or, if applicable, requires NEMS to pay itself more than the amount it pays others for the same service (and indicated that such additional amount would be substantial).

       11.    That indication came in the form of a claim (as stated in the AUSA letter) that "NEMS knowingly under-reported" millions of dollars to the State Medicaid program for "at least" five years (2005 through 2010) and, as a result, "could be liable under the False Claims Act for . . . $44,716,391, plus civil penalties." According to the AUSA, a *qui tam* action filed under that Act, which is currently under seal in this district, makes allegations along these lines, and includes the contention that the "knowingly under-reported" amount is the (trebled) difference between (a) what NEMS actually reported as receiving for the purposes of reducing the State's special payment obligation and (b) the full amount of the Medicaid capitation it receives. Stated otherwise, according to the AUSA's letter, the position advanced in the *qui tam* action is that NEMS must report its *entire* Medicaid capitation received under the SFHP/NEMS contract as a dollar-for-dollar offset to the State's Section 330 health center payment responsibility for the services that NEMS, as Medicaid health care provider, actually provides, even though that

1   capitation covers many other things, including but not limited to primary care to Medicaid

2   patients assigned to two other clinics (that are separate and independent from NEMS), specialty

3   care for those assigned to the other clinics, in-patient and out-patient hospital services provided

4   by physicians (other than hospital staff), management and coordination (and record-keeping and

5   reporting) of patient care for all capitated patients and services, and acceptance of risk.

6       12.     According to the AUSA's letter, the United States is deciding whether to assume

7   responsibility for the *qui tam* action.

8       13.     The State of California's Medicaid program ("Medi-Cal") is in support of the

9   position expressed in the AUSA's letter. It has already advanced a remarkably similar position

10   against another Section 330 health center (that, like NEMS, is engaging in MCO-like activities) in

11   the form of a claim against the center (subject to that center's administrative appeal before

12   California's Department of Health Care Services ("DHCS")). The State's support is evident from

13   its participation in the AUSA investigation and the indication of a Medicaid division of its

14   Attorney General's Office that such participation is for the purpose of determining whether to

15   bring its own false claims action against NEMS, this time under California law.  Under 42 U.S.C.

16   § 1396h, California's share of recovered (and improperly charged) expenses to Medicaid is ten

17   percent (10%) greater than its share for such costs properly charged.

18       14.     The harm or hardship that makes this dispute ripe for review is not that NEMS

19   faces a *qui tam* action or the prospect of having to defend itself against other enforcement actions,

20   should the state and/or federal government decide to pursue them, but rather the compliance

21   dilemma it faces as a result of an AUSA's letter purporting to give an authoritative interpretation

22   of statutory and regulatory provisions that have a direct and immediate effect on NEMS' current

23   and continuing operations. This action is necessary for NEMS to protect its continuing interests

24   and the interests of the community it serves, by, among other things: (a) providing services (paid

25   for by governmental programs and private parties); (b) expanding its activities beyond those of a

26   health care service provider, as authorized both by the Medicaid Act and Section 330 (which

27   makes available financial support to enable centers to engage in HMO/MCO-like activities); and

28   (c) complying with its responsibilities under Section 330, including (among others) "assuring

1 effective utilization of grant funds and maximizing non-grant revenue." 42 C.F.R. §
2 51c.204(a)(5).

3     15.    This past Thursday, May 31, 2012, was the deadline for NEMS to file its Medi-Cal
4 Reconciliation Report for the fiscal year ending on December 31, 2012. That report is designed to
5 reflect, for that particular fiscal year, all of the payments that NEMS received (in the
6 circumstances, from itself) for the services it provided (as a care provider) that must be paid the
7 special amount and act as an offset to the state's (special) payment obligation to NEMS. While
8 NEMS completed and filed the report in a manner consistent with its past practice and
9 understanding of the applicable federal and state law requirements (including clause (ix)), it felt
10 compelled to alert DHCS (the state agency that administers the Medicaid program) to the
11 AUSA's letter and its contrary legal conclusions and indications that NEMS, in that
12 Reconciliation Report, should be reporting for offset purposes the *entire* Medicaid capitation it
13 receives from SFHP. In its Reconciliation Report submission, NEMS further advised DHCS that
14 it would be filing an action in federal court for declaratory and injunctive relief as to its status and
15 eligibility to participate in Medicaid managed care and its rights to FQHC reimbursement as
16 stated in NEMS counsel's letter, to which the AUSA's letter responds. Its reference, of course,
17 was to this case.

18     16.    The issues and parties in this case are different than the issues and parties in the
19 *qui tam* action. The *qui tam* action presents a retrospective issue of whether NEMS, functioning
20 as a risk contractor, knowingly submitted false claims for payment from a federal health care
21 program. The parties, as it stands, include the relator in that action (on behalf of the United
22 States) and NEMS.

23     17.    In contrast, *this* action is concerned with prospective issues raised by the AUSA's
24 letter that the *qui tam* action may not, will not, or cannot resolve, including: (a) whether the
25 position expressed in the AUSA's letter is unsupported by any (properly promulgated) rule or
26 regulation and (as NEMS also herein contends) is a departure from existing policy on the
27 substantive rights of Section 330 health centers and also contrary to law (*e.g.,* the Medicaid Act,
28 the Public Health Service Act, and Administrative Procedure Act (5 U.S.C. § 553 *et seq.*)) (and,

1  as such, would also violate other applicable federal laws, including but not limited to, federal

2  appropriations and budgeting acts); (b) whether NEMS is eligible to operate as or in the manner

3  of a Medicaid MCO under 42 U.S.C. § 1396b(m) and implementing regulations; and (c) whether

4  the payments that must be made by a state Medicaid program to a Section 330 health center under

5  42 U.S.C. § 1396a(a)(15) for services described in § 1396d(a)(2)(C) in accordance with 42 U.S.C.

6  § 1396a(bb) are reduced only by the amount a center receives from a managed care contractor or

7  subcontractor for providing those specific services (*i.e.*, those described in § 1396d(a)(2)(C)); (d)

8  whether the "not less than" standard in 42 U.S.C. § 1396b(m)(2)(A)(ix) governs the amount that

9  NEMS, operating in the manner of an MCO, must pay itself for the services described in §

10  1396d(a)(2)(C) that NEMS itself provides through its own health care "staff"; and (e) whether

11  clause (ix) means anything other than its literal wording of "not less than."

## JURISDICTION AND VENUE

12

13  18.    Jurisdiction is proper under 28 U.S.C. §§ 1331, 1343, 1345, 1349 1357, and 1367.

14  Venue is proper in this District under 28 U.S.C. §§ 84 and 1391. Remedial action by this Court

15  against federal and state defendants is, *inter alia*, authorized for both federal and state defendants

16  or separately for one or the other under 42 U.S.C. §§ 1983 and 1985, the Appropriations,

17  Supremacy, Necessary and Proper, Property and other applicable Clauses of the U.S.

18  Constitution, and Section 330 and related federal law, 42 U.S.C. §1320a-10, and the

19  Administrative Procedure Act.

## PARTIES

20

21  ### Plaintiff

22  19.    Plaintiff NEMS is a California non-profit corporation and Section 330 PHS Act

23  health center grantee serving the poor and medically-underserved populations of the San

24  Francisco Bay Area. Although Section 330 grants are made for one-year terms, most of the

25  health center grantees in the Section 330 program are continuing recipients of those one-year

26  grant awards. The program as it was conceived and has been thereafter administered by HHS (and

27  its predecessor, the Department of Health, Education and Welfare) contemplates continuing

28  grants and grantees. NEMS has been a continuous health center grantee under the current version

1  of Section 330 and its predecessors for 38 years (including 1976 when its grant exceeded
2  $100,000). As a provider of medical care, NEMS currently serves approximately 37,000 patients
3  to whom its staff of doctors and other medical professionals provide approximately 196,000
4  patient visits per year.

5      20.     As is the case with other health centers receiving funds under Section 330, NEMS
6  employs and sometimes contracts with physicians and other licensed health care professionals
7  comprising its staff to provide care to its patients. To an observer unaware of NEMS' "health
8  center" status under Section 330, the center looks like a regular, albeit large, physician's office or
9  clinic, with a reception area, a waiting room, physicians and other providers on-site seeing
10  patients, equipment for tests (such as x-ray and ultrasound machines), a pharmacy, *etc*.

11     21.     As to its patients, the only difference between its health center status and a
12  privately owned and operated physicians' office or clinic is the fees those patients are charged.
13  That difference does not arise if a patient is insured. To the extent that NEMS' patients have
14  private health insurance, or public insurance such as Medicaid or Medicare, the patients are asked
15  for their insurance card/information and the insurer is billed by NEMS for the service(s). But if
16  the patient has no private insurance and is not eligible for a public insurance program (health
17  centers must assist patients to become insured if they are eligible but have not enrolled), he or she
18  is then asked about income. If the patient's or the patient's family's income is above 200 percent
19  of the federal poverty level, the patient is charged NEMS' "standard fee," unless exigent
20  circumstances indicate that the patient cannot pay that fee or anything at all. If, however, as is
21  usually the case, the patient's income is below that line, the patient is charged a sliding fee –
22  constituting a substantial discount from the standard amount. If the patient cannot even pay that
23  amount, the patient is allowed to pay less or nothing at all. Section 330 grant funds are available
24  to pay the costs of services (and items) provided to these (poor) patients. The Section 330
25  requirements described in this paragraph arise under 42 U.S.C. § 254b(k)(3). The above and any
26  later reference to NEMS' "standard fee" is to the amount determined under 42 U.S.C. §
27  254b(k)(3)(G)(i).

28                          **Defendants**

                          8
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

22.     Defendant Department of Health Care Services ("DHCS") is the State agency to which the State's responsibility for the State of California's Medicaid program (known as "Medi-Cal") has been assigned. 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10.

23.     Defendant Toby Douglas is the Director of DHCS. He is sued in his official capacity.

24.     Defendant State of California is ultimately responsible to the United States for maintaining and operating its Medicaid program as federal law requires. In particular, it is responsible for paying its share of the costs of its Medicaid program, as determined under the Medicaid Act and other applicable federal law.

25.     Defendant United States Department of Health and Human Services ("HHS") is the federal agency that regulates and otherwise oversees State administration of the Medicaid program. The Medicaid statute, regulations promulgated thereunder and other requirements of, and approvals by, HHS (and/or the Centers for Medicaid and Medicare Services ("CMS"), a division within HHS to which the responsibility for administering the Medicaid program has been delegated), or generally applicable laws, regulations or directives (such as those issued by the Office of Management and Budget)) constitute the federal requirements that govern HHS/CMS' administration of the Medicaid program and a State's conduct of *its* Medicaid program.

26.     Defendant Kathleen Sebelius is the Secretary of HHS. She is sued in her official capacity.

## GENERAL ALLEGATIONS

27.     Section 330 Health Centers, including NEMS, must meet the following legal standards, all of which, among others, must be met by any entity in order to be a "health center" and receive grant funds under Section 330. NEMS meets these standards and therefore: (1) is located in a medically underserved area or serving a medically underserved population (42 U.S.C. § 254b(a)(1)); (2) is community-based – *i.e.*, a majority of its Board of Directors must be patients of the center "who, as a group, represent the individuals being served by the center . . ." (42 U.S.C. § 254b(j)(3)(H)(i)); (3) provides an especially comprehensive range of "primary" and other health services to its patients through its staff of physicians and other health care providers

9

(42 U.S.C. §§ 254b(a)(1)(A) and 254b(j)(3)(A)); (4) provides health care services to Medicaid recipients (42 U.S.C. § 254b(j)(3)(E)); and, (5) serves all residents of its community, regardless of any resident's/patient's ability to pay (42 U.S.C. §§ 254b(a)(1) and 254b(j)(3)(G)(i)).

28.     The HHS Secretary's authority to delegate the administration of the Section 330 grant program to a unit or division of HHS is limited by 42 U.S.C. § 254b(o), which restricts the delegation of Section 330 grant-related responsibilities "[to] the central office of the Health Resources and Services Administration" ("HRSA"). HRSA, acting through its centrally located and operated Bureau of Primary Health Services ("BPHC"), along with certain other HRSA central office units, has in fact been delegated such responsibilities.

29.     Under Section 330, NEMS receives grant funds to carry out the multitude of services Section 330 requires or permits. *See* 42 U.S.C. § 254b(b)(1) and (2). NEMS also receives payments for services from uninsured patients, whose payment responsibility is based on the above-described sliding fee scale, which is designed to charge no more than what effectively are token amounts to persons who are under 200 percent of the poverty line. Patients with health insurance (Medicaid, Medicare, private companies, *etc.*) are treated the same as they would be in an ordinary doctors' office where that office accepts the assignment of patients' insurance rights and limits its patients' bills to any co-payments or deductibles those insurers may require. Section 254b(k)(3)(G)(ii)(II) prohibits giving those "insurers" any discount on the health center's standard fee, which must cover the center's cost and be no less than "consistent with locally prevailing rates." *Id.* at § 254b(k)(3)(G)(i).

30.     As a result of Section 330 requirements as well as those of implementing regulations, including, but not limited to, 42 U.S.C. § 254b(e)(5)(D) and 45 C.F.R. § 74.24, all income of any consequence received by a health center in addition to Section 330 grant funds remains governed by Section 330 requirements. In the process, just as is the case with grant funds, such income becomes "federal funds" as to which a health center has trust responsibility. *See, e.g., Neukirchen v. Wood County Head Start, Inc.*, 53 F.3d 809, 812-14 (7th Cir. 1995); *In re Joliet-Will County Community Action Agency*, 847 F.2d 430, 433 (7th Cir. 1988); *Palmiter v. Action*, Inc., 733 F.2d 1244, 1247 (7th Cir. 1984).

1

### Section 330 Subsidy of the Medicaid Program

2      31.     As just explained, federal grant funds awarded under Section 330 of the PHS Act

3    are to be used solely for poor patients who lack health insurance and who therefore cannot obtain

4    care from private sector physicians or clinics. Federal grants are not to be used as a subsidy to

5    public or private "insurers" (including Medicaid) by giving them a discount off the center's

6    standard fee.

7      32.     Enforcement by health centers of the foregoing no discount requirement insofar as

8    Medicaid (and Medicare) is concerned is, and over the years has been, no cinch. The simplest

9    way to assure payments from private or public insurers (other than Medicaid and Medicare) at

10   undiscounted rates is to refuse to contract with an insurer that will not agree to or otherwise fails

11   to pay those rates. For private insurers this method is, and can easily be, employed.

12     33.     As to Medicaid and Medicare, because centers are required to participate in those

13   programs, 42 U.S.C. § 254b(k)(3)(E) and (F), the option of refusing to contract with those

14   programs is unavailable.  In its history behind the first iteration of Section 330 (in 1975) Congress

15   (ruefully) acknowledged that the Medicaid and Medicare programs were not required to pay

16   health centers as much as would be needed to satisfy the no discount requirement.

17     34.     Saddling centers with a no-discount requirement and mandate to contract with the

18   Medicaid and Medicare programs that did not have to pay them as much as their undiscounted

19   rate at first blush hands them a duty they will be unable to carry out (and confronts the centers

20   and responsible federal officials with an impossible to resolve enforcement problem). Subsections

21   (k)(3)(F) and (G)(ii) of Section 330 (previously in other sections of earlier versions of Section

22   330) required a health center that was faced with a Medicaid program paying less than the Section

23   330 billing and collecting requirements demanded, to "make and . . . continue to make every

24   reasonable effort" to collect what Section 330 requires. Accordingly, to the extent the center

25   made such efforts, it satisfied its burden to enforce the no discount requirement.

26     35.     The practical result of the no discount limitation and the requirement of centers to

27   make every reasonable effort to collect changed dramatically in 1989 when Congress passed

28   amendments to the Medicaid Act and (and a year later to the Medicare Act) that required those

1    programs to pay Section 330 centers the full amount of the centers' reasonable costs (effectively,

2    the centers' standard fee). Accordingly, centers making every reasonable effort to collect became

3    able to collect what Section 330 required. The new payment requirement included giving Section

4    330 centers a new Medicaid (and later Medicare) - only name, "Federally-qualified health

5    centers" ("FQHCs") (a name that also applied to a few other types of similar entities.) Some

6    background on the Medicaid program is needed for a full understanding of the 1989 change.

7    <div align="center">**The Medicaid Program**</div>

8    36.    The Medicaid program began in 1965. It is generally described and thought of as a

9    joint federal-state undertaking to provide health care services to certain needy and

10    underprivileged populations. States are responsible for the conduct of the activities the program

11    authorizes by engaging the services of hospitals, clinics, physicians, *etc*., to provide Medicaid-

12    covered health care services to that State's program beneficiaries. Participation in the Medicaid

13    program by any State is voluntary. However, once such an election is made, the State must

14    comply with all federal requirements governing the program. California has elected to participate

15    in Medicaid.

16    37.    Any State that has elected to participate in the Medicaid program must submit and

17    have approved a State Medicaid plan, which contains provisions and requirements regarding

18    groups of individuals covered, eligibility conditions, medical care and services to be provided and

19    paid for, payment rates and mechanisms, and compliance with program requirements, among

20    others. *See*, *generally*, 42 U.S.C. § 1396a and 42 C.F.R. §§ 430 *et seq*. A State plan also "must

21    describe the policy and methods to be used in setting payment rates for each type of service

22    included in the State's Medicaid program." 42 C.F.R. § 447.201(b).

23    38.    The payment for the services of Section 330 health centers, such as NEMS, is

24    stipulated in the current Medicaid Act in 42 U.S.C. § 1396a(bb). Under that section, FQHCs and

25    rural health clinics, whose payment also is stipulated in section 1396a(bb), have specified

26    payment levels. All other health care providers' payments are subject to the tender mercies of

27    vague and generally applicable law and regulation and state budget crises that, as a practical

28    matter, produce payment levels substantially less than the (not so great) rates of commercial

1  health care insurers. California's State Medicaid Plan contains payment provisions for Federally-
2  qualified health centers, such as NEMS.

3      39.    The federal Medicaid funds that States receive – referred to in the Medicaid statute
4  as Federal Medical Assistance Payments ("FMAP") – cover a percentage of the State's Medicaid
5  expenses. If a State program has an FMAP of 50 percent, the program receives $5 of federal
6  funds for every $10 it spends on Medicaid services (the net cost to the State (its "match") being
7  $5). FMAPs vary depending on the type of activity involved. The aggregated average FMAP for
8  all of California's Medicaid activities has been running at or slightly higher than 60 percent.

9      40.    CMS and HRSA, respectively delegated responsibility for Medicaid and Section
10  330, are separate and independent divisions of HHS with no authority over the particular law or
11  activities thereunder for which the other has responsibility.

12  <center>**FQHC Payment and Services in the Medicaid Program**</center>

13      41.    Among its many requirements, the Medicaid Act requires that certain services be
14  provided by a state as a condition of its participation in the Medicaid program. 42 U.S.C. §
15  1396a(a)(10)(A). Included among these required services are those of Section 330 health centers
16  and other FQHCs. Payment for the services of FQHCs to which "all individuals" who qualify for
17  Medicaid benefits are entitled, are those defined in 42 U.S.C. §§ 1396d(a)(2)(C), which applies to
18  "Federally-qualified health center services (as defined in subsection (l)(2) [of § 1396d]) and any
19  other ambulatory services offered by a Federally-qualified health center and which are otherwise
20  included in the plan." (All such services are hereinafter, for the sake of simplification, referred to
21  as "FQHC services").

22      42.    The phrase "any other ambulatory services offered by a Federally-qualified health
23  center and which are otherwise included in the plan" automatically captures most of the
24  "mandatory" services "listed in paragraphs (1) through (5), (17) and (21) of section 1396d(a)," 42
25  U.S.C. § 1396a(a)(10)(A). These include services such as nursing facility services, physicians'
26  services, medical and surgical services performed by a dentist or doctor of dental surgery, nurse-
27  midwife services, and certified pediatric nurse practitioner or certified family nurse practitioner
28  services as described in the relevant paragraphs The "other services" listed in the balance of the

1  paragraphs of § 1396d(a) are commonly included in State Plans, such as medical or remedial care
2  offered by a licensed practitioner acting within the scope of his or her practice as defined by State
3  law, home health services, clinic services, dental services, physical therapy services, case
4  management services, and preventive/rehabilitative services. 42 U.S.C. § 1396d(a).   These
5  (voluntary) other services are in California's State plan.

6       43.     What the foregoing means is that as long as NEMS continues to qualify as a
7  Medicaid FQHC, for *any* ambulatory care services it provides with respect to (and in accordance
8  with the Medicaid Act's definition thereof) any service covered by California's Medicaid
9  program, NEMS must be paid at its special FQHC rate. For example, NEMS is entitled to the
10  FQHC special payment when it performs "physicians' services," which may be rendered "in the
11  office, the patient's home, a hospital, or a nursing facility, or *elsewhere*." 42 U.S.C. §
12  1396d(a)(5)(emphasis added); *see also* 42 C.F.R. § 405.2412(a) (defining "physicians' services"
13  as "professional services that are performed by a physician at the clinic or are performed away
14  from the clinic by a physician whose agreement with the clinic provides that he or she will be
15  paid by the clinic for such services"). Similarly, NEMS must receive its special payment for
16  "clinic services furnished by or under the direction of a physician," if included as a covered
17  service in the State Plan, and if provided by NEMS. Those services may be furnished inside or
18  "outside the clinic by clinic personnel to an eligible individual who does not reside in a
19  permanent dwelling or does not have a fixed home or mailing address." 42 U.S.C. §
20  1396d(a)(5)(A) and (9).

21       44.     In this regard, Section 330 (at 42 U.S.C. § 254b(a)(1)), authorizes centers to
22  provide services with their own employees as well as "through contracts or cooperative
23  arrangements with" other care providers. Guidelines issued by the Bureau of Primary Care further
24  describe what a health center does in serving its population and area. According to those
25  guidelines, in accomplishing their mission of providing primary health care and related services
26  to medically underserved populations and communities, FQHCs must utilize a variety of "service
27  delivery models" tailored to the needs of the center's particular population and community.
28  "Many health centers operate primarily fixed-site locations. Others offer services in locations

1  ranging from homeless shelters to migrant farmworker camps to public housing communities to
2  schools. Some use vans to bring specific services to a broad audience or reach a highly mobile
3  population. Many operate from several locations, including off-site locations. Programs serving
4  people who are homeless or mobile engage in extensive outreach to provide services wherever the
5  patients are." Health Center Program Expectations, Bureau of Primary Health Care Policy
6  Information Notice 98-23 (Aug. 17, 1988) at pp. 15-16 (Bureau's "expectations for all health
7  center programs covered under section 330 of the Public Health Service), available at
8  ftp://ftp.hrsa.gov/bphc/docs/1998pins/PIN98-23.PDF (last accessed June 1, 2012)).

## FQHC Medicaid Payment Requirements

### Reasonable Costs (1989 – 2000)

11      45.    The 1989 Omnibus Reconciliation Act, along with amendments in 1990,
12  prescribed the first FQHC payment requirement at "100 percent of [each FQHC's] costs which
13  are reasonable . . ." 42 U.S.C. § 1396a(a)(13)(E), later reclassified at 42 U.S.C. §
14  1396a(a)(13)(C). Through December 31, 2000, the Medicaid statute continued to require States to
15  pay all reasonable costs of FQHCs for services provided to Medicaid recipients. The payment
16  process California used to implement the foregoing payment requirement was based on Medicare
17  FQHC regulations, to which the Medicaid FQHC payment requirement referred. The process
18  worked as described in succeeding paragraphs.

19      46.    An FQHC would first file a claim with a State's Medicaid agency, typically for the
20  preceding month, for an "advance" against the 100 percent cost the FQHC would eventually be
21  due. In return, the State would pay the FQHC a previously determined "interim" rate for each
22  visit. For California (and most States) that interim rate computed on a visit basis that was derived
23  from the 100 percent reasonable cost calculation for the prior year.

24      47.    At the end of the FQHC's or State's fiscal or otherwise designated year, the FQHC
25  would file a cost report with the State Medicaid agency based on the FQHC's annual and (for
26  Section 330 centers) statutorily required independent audit. The cost reports with certain changes
27  are the same as used for Medicare FQHCs and are formatted so as to correspond to findings in
28  such audits calculating the FQHC's total reasonable costs for the (FQHC payment) year. The

1    total of the FQHC's reasonable costs shown on the report (which were the costs of care of the

2    types covered by the FQHC payment for *all* the FQHC's patients (not just those in Medicaid)

3    were then divided by the number of "visits" for those services provided (again) to all of the

4    FQHC's patients) to produce the actual per visit rate for that (then) just-ended year. The per visit

5    rate resulting from this calculation was multiplied by the number of visits by Medicaid patients

6    (as opposed to visits of patients not in Medicaid) with FQHC doctors or other professionals. If

7    half the visits were with Medicaid patients, Medicaid would be responsible for half the total costs.

8    If the sum produced were more than the amount the State paid to the FQHC as the advance or

9    interim payment, the State would pay the FQHC the difference and *vice versa*. This process was

10    referred to as "reconciliation."

11         48.      To illustrate the foregoing "reconciliation" process, assume that at the end of the

12    FQHC payment year:

13         A. An FQHC had received interim payments totaling $450 from the State

14             Medicaid agency for all of its Medicaid-covered visits for that year.

15         B. During that year, there had been 100 "visits" in which services of the type

16             covered by Medicaid were provided by the FQHC's staff of doctors and certain

17             other professionals authorized to conduct FQHC service "visits" to all of the

18             center's (Medicaid and other) patients, of which 50 visits were for treatment of

19             Medicaid patients.

20         C. Based on the FQHCs cost report for that year, the total reasonable costs the

21             FQHC had incurred for all such visits amounted to $1,000.

22         49.      Under the foregoing assumptions, the FQHC's per visit rate for the year would be

23    $1,000/100 total visits = $10 per visit; and the total amount owed to the FQHC by the State

24    Medicaid agency would be 50 Medicaid visits x $10 = $500. Because the FQHC had already

25    received $450 from the State Medicaid program, the center would now be owed an additional $50

26    from that program to equal the $500 due for that year. In the following year, the FQHC's interim

27    rate would typically be the $10 per-visit rate calculated for that previous year, subject (at the end

28    of the next year) to the same reconciliation process.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Fixed Per Visit Fee

50.    In December 2000 legislation, Congress created a new statutory standard for payment of FQHC services by a State Medicaid program (codified at 42 U.S.C. § 1396a(bb)); essentially a proxy for all of each FQHC's actual Medicaid costs. The 2000 law (which is in effect today and has been used above in references to required FQHC payments) changed the FQHC payment to a per visit fee based on 100 percent of the FQHC's reasonable costs of care for treating Medicaid beneficiaries in FY 1999 and 2000 calculated on a per visit basis. In other words, the per visit cost for those two years became the per visit fee.

### Purpose and History of FQHC Special Payment

51.    Congress' stated purpose in requiring the special FQHC Medicaid payment was expressed in the Report of the House Budget Committee accompanying H.R. 3299 (the House version of the 1989 OBRA):

> Medicaid payment levels to Federally funded health centers cover less than 70 percent of the costs incurred by the centers in serving Medicaid patients. The role of [health centers] . . . is to deliver comprehensive primary care services to underserved populations or areas without regard to ability to pay. To the extent that the Medicaid program is not covering the cost of treating its own beneficiaries, it is compromising the ability of the centers to meet the primary care needs of those without any public or private coverage whatsoever.
> ***
> *To ensure that Federal PHS Act grant funds are not used to subsidize health center or program services to Medicaid beneficiaries*, States would be required to make payment for these [FQHC] services at 100 percent of the costs which are reasonable and related to the cost of furnishing these services.

H.R. Rep. No. 101-247, at 392-93, reprinted in 1989 U.S.C.C.A.N. 2118-19 (emphasis added).

### Managed Care "Problem"

52.    In its early form, the Medicaid program States administered was confined to a fee-for-service approach. To provide care under that program, States would directly contract with doctors, hospitals and others for services and other items or benefits, such as equipment or supplies (*e.g.*, prescription drugs). Such "providers" would be paid specified fees for their services based on fee schedules that would be applicable to all providers of a similar service in a similar area. Other items or benefits were likewise subject to payment schedules.

17

53. "Managed care" was and is an alternative payment approach, involving health maintenance organizations ("HMOs") and similar entities, which, as previously explained, for Medicaid purposes, are now statutorily named "managed care organizations" ("MCOs"). The approach was first authorized in 1976 under 42 U.S.C. § 1396b(m). Pub. L. 94-460. For a number of reasons, for more than a decade afterward, Medicaid managed care was used on a very limited basis by the States (and only a few States). In the 1990s, however, States, with the encouragement of the Clinton administration, began to adopt "managed care" to administer at least some substantial part of their Medicaid programs. California was one of many such States to implement this approach. The FQHC payment then required by the Medicaid Act for such states was that the managed care providers (principally HMOs) would pay the FQHCs the 100 percent (100%) of costs required and the State would pay the managed care providers extra for amounts they paid the centers over what they paid others for the same services

54. Despite the FQHC payment right, in States that adopted managed care that right was largely ignored. In Medicaid managed care, the State Medicaid agency contracts with (with limited exception) entities that manage and provide the required care. Because the current legal designation of most (but not all) such entities is managed care organization ("MCO"), references herein to "MCOs" (unless otherwise indicated) are shorthand for the entities that have been and continue to be authorized to carry out managed care.

55. MCOs are paid a fixed monthly sum ("capitation") to provide Medicaid covered services (often with some services or populations remaining in fee-for-service) to Medicaid beneficiaries. When MCOs replace the State Medicaid agency as the entity that contracts with and pays providers, the MCOs pay providers negotiated sums. Between requirements of federal law and the fact that certain FQHCs are needed to ensure enough care to Medicaid beneficiaries within the medically underserved populations and areas served, MCOs as a practical matter have to enter into provider contracts with FQHCs. But paying FQHCs by calculating a 100 percent cost reimbursement through a Medicare program methodology (as the States were being required to do in fee-for-service Medicaid programs) – which also would frequently result in paying health

centers more for services than other MCO contracted providers – was not something MCOs were prepared or equipped to do.

56.     While Congress somewhat had anticipated this problem by amending the Medicaid Act to require States to pay the MCOs an extra amount to cover the MCOs' extra costs of paying the FQHCs, the fact remained that MCOs knew nothing about paying reasonable costs based on cost reports. In addition, States utilizing managed care had no interest in or desire to oversee the FQHC payment requirement. States had contracted with MCOs to relieve themselves of the burden of negotiating care provider contracts, processing provider claims, *etc.* As a result, although States gave the MCOs extra FQHC-related money, the extra funds were not in proportion to the extra costs the particular MCO would or did incur in contracting with and paying FQHCs the legally required 100 percent cost amount. The universal reality became that FQHCs in a Medicaid managed care system were not paid the special rate the Medicaid statute required.

57.     Eventually, after hearing complaint after complaint from the health centers that in managed care they were not being paid as required by federal law, Congress decided a change was needed. In the Balanced Budget Act ("BBA") of 1997, Section 4712, Congress did two things. It first removed the MCOs' financial responsibility to pay the FQHCs their special FQHC rate and instead required the MCOs to pay FQHCs "not less" than they would pay non-FQHC providers for the same medical services. 42 U.S.C. § 1396(m)(2)(A)(ix) (1997).

58.     The second thing Congress did was to ensure that FQHCs were reimbursed the amounts federal law called for by switching the requirement of the State to pay MCOs extra for to requiring States to make a direct "supplemental payment [to FQHCs] equal to the amount . . . by which" an FQHC's reasonable costs "exceed[ed] the amount of payments" FQHCs received from MCOs. 42 U.S.C. § 1396a(a)(13)(C) (1999). Thus, if the MCO paid an FQHC $100 for a Medicaid managed care visit and the reasonable costs incurred by the FQHC in the year in question were $150, the State was required to make a supplemental payment of $50. (This supplemental payment has become known as a "wraparound" and remains a feature of the

Medicaid Act. The FQHC legislation in December 2001 that charged the FQHC payment into a per visit rate continued the wraparound requirement.

59.     California has had a Medicaid managed care program in effect at least since the 1997 BBA FQHC payment amendments. Accordingly, it has been required for twelve years to make "wraparound" payments to FQHCs to cover any difference between what the FQHCs were paid by the MCOs and the special payment levels to which FQHCs were and are entitled.

<center>FQHC Medicaid Payment Requirements</center>

<center>Fixed Per Visit Fee (2001 to present)</center>

60.     As mentioned above, in December 2000, Congress changed the methodology for FQHC reimbursement from a cost based system to a Prospective Payment System ("PPS"). Title 1, Section 702 of the Consolidated Appropriations Act for FY 2001, Pub. L. No. 106-554 (Dec. 21, 2000) ("BIPA 2000"), now codified at 42 U.S.C.A. § 1396a(bb) (2002 Supp.). Under § 1396a(bb)(1)-(5), instead of each year having to calculate and pay each FQHC's reasonable costs, States were authorized to avoid the calculation process and pay a proxy for such costs. That proxy required States to go through one more calculative process to determine the average of 100 percent of each FQHC's reasonable costs in furnishing Medicaid services, this time for fiscal years 1999 and 2000, and convert that result into a per-visit rate.

61.     Beginning January 1, 2001, States had to pay FQHCs that (new) fixed per-visit rate. For each year after FY 2001, beginning October 1, 2001, that rate had to be adjusted by the percentage increase of the Medicare Economic Index ("MEI"). Adjustments were also to be made for increases or decreases in the scope of an FQHC's services. The new per visit rate approach is commonly referred to (and referred to below) as the "prospective payment system" or "PPS."

62.     Section 1396a(bb)(5) retained State responsibility for making supplemental or wraparound payments to FQHCs in managed care situations, but made certain changes to the previous "system." The time limit for States to make wraparound payments changed from three months to four. The 2000 law also allowed States and the FQHCs to use an alternative payment methodology, so long as the FQHC agreed and the alternative resulted in payments that were not

<center>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</center>

1    less than the amount that the FQHC would have otherwise been paid under the straight PPS per

2    visit rate approach.

### Medicaid Managed Care Law and Regulation *Vis-à-vis* Section 330 Public Health Service Act Grantee Health Centers

6        63.    Federally-qualified health center ("FQHC") payment, and the right of beneficiaries

to the services of an entity entitled to that payment, fully satisfies the Section 330 requirement on

its grantees to obtain payments from Medicaid (among others) that are not less than their costs of

Medicaid services.

### Managed Care (and Related) Entitlements to Section 330 Public Health Service Act Grantee Health Centers

11       64.    Section 330 in specific ways authorizes its health center grantees to expand their

activities to include functioning in the manner of an MCO (or as a managed care plan under other

federal or state laws) on its own or as part of a network of other Section 330 grantees. Such

authority is explicitly conferred by the following:

> A.  Section 330(c)(1)(B) providing grants to a center or centers to cover the costs
>     of planning and developing such entities;
>
> B.  Section 330(d) providing a center or centers loan guarantees for developing,
>     operating, and owning the managed care plan described in Section
>     330(c)(1)(B); and
>
> C.  Section 330(e)(1)(C) providing grants to a center or centers for the costs of
>     operations of the plan described in Section 330(e)(1)(B).

22       65.    There are two sections of the Medicaid Act that govern managed care: 42 U.S.C.

§§ 1396b(m) and 1396u-2. Unlike Medicaid in general where the relationship between the states

and the federal government is viewed as a joint effort or partnership that allows states broad

discretion in implementing their Medicaid programs, §§ 1396b(m) and 1396u-2 impose strict

requirements and substantial federal oversight in regard to Medicaid managed care, including §

1396b(m)(2)(A)(i)-(xiii), which requires federal (delegated to CMS) prior approval of all

managed care contracts (with, in light of implementing regulations, two exceptions that apply principally to Section 330 health centers).

66.     The exceptions are found in § 1396b(m)(2)(A), which begins with the following– "[e]xcept as provided in subparagraphs (B) . . . and (G)," the prior federal approval requirements under § 1903(m)(2)(A)(i) through (xiii) apply. Both (B) and (G) authorize Section 330 grantees (and grantees receiving Appalachian Regional Commission funding) to be MCO equivalent managed care contractors. *See* S. Rep. No. 99-146 for Pub. L. 99-272, Comprehensive Omnibus Budget Reconciliation Act  of 1986 (Oct. 2, 1985), explaining intent behind (B) and (G) as allowing those covered therein to act as if they were federally qualified HMOs, which qualified and continue to qualify (automatically) under § 1396b(m) as MCOs.

67.     Subparagraph (B) (which was included in the original enactment of Section 1903(m)) applies under today's Medicaid and health center laws to any Section 330 grantee that first received a 330 grant of at least $100,000 in fiscal year 1976. NEMS is one of a comparative very few of today's Section 330 grantees that qualifies under and is protected by subparagraph (B).

68.     Clause (ix) (of 42 U.S.C. § 1396b(m)(2)(A)) was enacted in 1990 under section 4704(b)(2) of that year's Omnibus Budget Reconciliation Act as part of the provisions of that Act which amended the 1989 FQHC payment requirement (and added an FQHC payment requirement for Medicare).

69.     Until clause (ix) was enacted, subparagraph (B) (of (m)(2)) entities were exempted from the entirety of (m)(2)(A), and were eligible to receive MCO-like contracts without meeting any of (m)(2)(A)'s requirements (contained in today's (m)(2)(A) clauses (i) – (xiii). For Section 330 grantees that are covered by subparagraph (B), the sole purpose of applying clause (ix) to their MCO-like Medicaid contracts is to ensure that their payments to themselves for FQHC services (reducing State wraparound) will be governed by the same payment standard that would apply to a contract between such a grantee and an independent MCO.

70.     Subparagraph (G) applies to current recipients of Section 330 grants of "at least $100,000" and the prior two years.  It exempts such centers only from subsection (m)(2)(A)(i)

1  (limiting entities eligible for managed care contracts to those defined in Section 1903(m)(1) as

2  "managed care organizations"), and thereby exempts the centers from this licensing and solvency

3  requirements required for MCO status.

4      71.    The final § 1396b(m) contract authorization is subsection 1903(m)(1)(C)(ii)(IV),

5  which makes all FQHCs eligible by themselves or in concert with others (through a separate

6  corporate entity that may include an owner or owners that are not FQHCs as long as the non-

7  FQHCs separately or together own less than 50 percent) to receive managed care contracts as

8  MCOs, even though it specifically exempts them from otherwise applicable State licensing and

9  solvency requirements.

10     72.    The purpose behind these provisions is plainly to facilitate Section 330 center

11  participation in Medicaid managed care. It is also consistent with Congress' findings leading up

12  to and since the 1989 FQHC payment requirement that Medicaid patients of Section 330 centers

13  in the end (when the cost of all Medicaid services is taken into account) winds up costing State

14  Medicaid programs substantially less than patients of doctor groups and clinics (and the like)

15  providing the same services (regardless of whether the costs of the center's own services are more

16  than such other providers).

17                    **Managed Care Regulations at 42 C.F.R. Part 438**

18                    **Comprehensive Risk Contract Under §438.2**

19     73.    The medical service responsibilities a managed care contractor assumes under §

20  1396b(m)(2)(A) in a contract with the State (which requires prior CMS approval) are repeated in

21  42 C.F.R. § 438.2's definition of a Medicaid managed care program's "Comprehensive risk

22  contract" – *i.e.*, a capitated risk contract that covers "inpatient hospital services and any of the

23  following services listed" in that same definition or "any three or more of [those] services."

24  Those other than inpatient services include man (at least three) services that Section 330 centers

25  generally and NEMS specifically provide, such as outpatient hospital, FQHC, laboratory and x-

26  ray, PSDT, family planning and physician.

27     74.    Section 438.6(b) describes entities that "*are eligible for comprehensive risk

28  contracts...*" (italics in original). All are listed in §438.6(b)(1) through (5). Section 330

1  grantees/FQHCs are covered by subsections (b)(1), (2) and (3). Subsection (b)(2) and (3) refer

2  respectively, to Subparagraphs (B) and (G) (under Section 1903(m)(2) which are applicable to

3  Section 330 grantees). These subparagraphs, as previously discussed, make health centers eligible

4  for managed care contracts that otherwise could only be made with MCOs or an entity that met

5  MCO solvency requirements.

6  ### Managed Care FQHC Payment Requirement at 42 C.F.R. Part 438.6(l)

7  75.  Section 1903(m)(2)(A)(ix)'s "not less than" payment standard is a required term,

8  and prerequisite for federal approval of a "first-tier" Medicaid MCO contract. Indeed, it is the

9  only payment from an MCO to a provider that is governed by statute. In the preamble to the Part

10  438 regulations (that implement Medicaid managed care), CMS acknowledged that, while

11  payment rates between managed care contractors and subcontractors are not regulated, one of two

12  exceptions is "in the case of payments to FQHCs that subcontract with such contractors, which

13  are governed by section 1903(m)(2)(A)(ix)." 67 Fed. Reg. 40989-01, 40998-01, 2002 WL

14  1298625 (F.R.).

15  76.  As explained above, whether as an FQHC or Section 330 grantee, NEMS is

16  eligible for a Medicaid managed care contract under Section 1903(m). Based on prior allegations

17  and references herein, if it were a "first-tier" recipient of such a contract, there is no question that

18  it would be required by § 1903(m)(2)(A)(ix) to pay itself for its medical services what it pays

19  other providers for the same services.

20  ### San Francisco Health Plan MCO Contract

21  ### NEMS Managed Care Subcontract

22  77.  Under California's two-plan model of Medicaid managed care, DHCS offered and

23  awarded two contracts – one to a commercial MCO and another to a local initiative health plan –

24  to provide nearly all Medicaid covered services in the City and County of San Francisco. The

25  commercial plan is operated by Blue Cross Blue Shield of California and the local initiative plan

26  is operated by the San Francisco Public Health Authority under the name San Francisco Health

27  Plan ("SFHP").

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

78.     The DHCS-SFHP contract includes and delegates to SFHP the responsibility for complying with § 1903(m)(2)(A)(ix)'s "not less than" FQHC payment requirement. The DHCS-SFHP contract is subject to CMS' prior approval. 42 U.S.C. §1396b(m)(2)(A)(iii). In particular, the contract states that SFHP shall pay a Section 330 FQHC "not less than the level and amount of payment that Contractor makes for the same scope of services furnished by a provider that is not a FQHC..." It further provides a similar protection to payment rates to entities determined by the State to be safety-net providers (which include FQHCs).

79.     Under the DHCS-SFHP contract, SFHP is required to submit any provider or management subcontract for review and approval by DHCS. Such a subcontract can only become effective upon written approval by DHCS or by operation of law where DHCS acknowledges receipt of the proposed subcontract but fails to express written approval or disapproval within 60 days of receipt.    This requirement of the DHCS-SFHP contract is consistent with § 1396b(m)(2)(A), which states that the MCO may provide required services on its own or "through providers of [the] services" included in its State contract.

80.     In or about 2000, NEMS and SFHP entered into a *sub*contract under the DCHS-SFHP contract. The SFHP-NEMS contract imposes comprehensive risk on NEMS through capitation, delegates a range of management responsibilities needed to carry out the "managed" part of that managed care contract, and describes the health care services NEMS is responsible for under that contract (on its own and through other care providers).

81.     Put otherwise, the SFHP-NEMS contract, which pays NEMS a capitated rate for the services and activities the contract covers, is *not* a contract with NEMS in its role as care provider. While NEMS's medical services are certainly part of what the contract requires, the duties and responsibilities the contract imposes are those of a Medicaid managed care contractor – which Medicaid managed care regulations (at 42 C.F.R. Part 438) define as a "*Comprehensive Risk Contract.*" 42 C.F.R. § 438.2 (italics in original).

82.     Under §438.6(l), the NEMS subcontract "must fulfill the requirements of this part [438] that are appropriate to the service or activity delegated under the subcontract." NEMS' "comprehensive risk" subcontract includes delegations of the responsibilities that SFHP assumes

1    under its comprehensive risk contract with DCHS for the geographical area specified in the
2    contract and the SFHP Medicaid enrollees in that area. Those responsibilities include
3    subcontracting with other providers for the care NEMS does not itself provide, managing all such
4    care specified in the subcontract, accepting the risk that capitation payments by their very nature
5    impose, and otherwise making the array of Medicaid-covered services readily available to its
6    area's Medicaid population.

7        83.    Because the "requirements of [part 438] that are appropriate to the service or
8    activity delegated" to NEMS apply to the majority of services and activities SFHP must perform
9    under its prime contract with the State, the requirements that are appropriate under NEMS' SFHP
10   contract would include its eligibility for a comprehensive risk contract. There can be no doubt
11   that NEMS' is eligible to receive a comprehensive risk managed care contract under applicable
12   regulations, at 42. C.F.R. §438.6(b). The first three types of entities listed as eligible for a
13   managed care contract in that section include: (1) a managed care organization ("MCO"); (2)
14   entities identified in 42 U.S.C. §1396b(m)(2)(B)(i)-(iii); and (3) the "Health Centers identified in
15   § 1396b(m)(2)(G) of the Act."

16       84.    Furthermore, all categories of entities eligible for Medicaid managed care
17   contracts under 42 U.S.C. § 1396b(m) (except entities under §1396b(m)(2)(B)) must be given
18   contracts that conform to the requirements set forth in §1396b(m)(2)(A)(i) through (xiii) (but §
19   1396b(m)(2)(G) entities need not be MCOs under clause (i)). All entities eligible for a managed
20   care contract under § 1396b(m)(2) must comply with clause (ix) (including those to which
21   (m)(2)(B) applies, which receive a "total exemption" from the (m)(2)(A) requirements (as noted
22   in 42 C.F.R. §438.6(b)(3)), except that as shown above, the total exemption subparagraph (B)
23   covered entities was modified to make those entities subject to clause (ix)) must be given
24   contracts that comply with (m)(2)(A)(ix). As such, what NEMS must pay itself for its FQHC
25   services to Medicaid beneficiaries under its SFHP contract is what clause (ix) requires.

26                    **Plain meaning and effect of wraparound provision**

27       85.    The Medicaid Act's FQHC wraparound provision, 42 U.S.C. § 1396a(bb)(5)
28   provides that:

1

2

3

4

5

> In the case of services furnished by a Federally-qualified health center or rural health clinic pursuant to a contract between the center or clinic and a managed care entity (as defined in section 1396u–2(a)(1)(B) of this title), the State plan shall provide for payment to the center or clinic by the State of a supplemental payment equal to the amount (if any) by which the amount determined under paragraphs (2), (3), and (4) of this subsection exceeds the amount of the payments provided under the contract.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

86.    The plain language of this provision and the overall statutory scheme make clear that only payments for certain ambulatory "services *furnished by* [the FQHC]" can be used to offset the state's supplemental payment obligation. Those services that receive the special payment under § 1396a(bb) are described in§1396d(a)(2)(C) are "Federally-qualified health center services (as defined in subsection (l)(2) [of this section] and any other ambulatory services *offered by a Federally-qualified health center*" that are otherwise included in the state plan. That description or definition is plainly limited to ambulatory services provided by the center itself. That special payment for FQHC services is in the first instance "*determined under* paragraphs (2), (3), and (4) of this subsection" necessarily means that the state Medicaid program's FQHC service payment per visit obligation is offset only by the FQHC's receipts of payments from managed care contractors that are either the whole or a part of the special payment. It necessarily follows that payments by contractors for services or activities that are not eligible for FQHC payments do not count for purposes of that offset. If, for example, an FQHC were to receive MCO payments for operating a surgical facility devoted to brain surgery, a service that is not by any stretch of imagination among the services to which the FQHC payment obligation is applicable, those payments on the sole basis of clear statutory language would and could not be an offset to that obligation.

23

24

25

26

27

28

87.    In other words, it is clear that the center's per-visit rate does *not* include, and thus does not reimburse the center for, among other things, a variety of costs that a managed care capitation is designed to cover – *e.g.*, the cost of services furnished by providers (other than the center), the cost of comprehensive risk management and care coordination (and record-keeping and reporting), and acceptance of risk. Any portion of the capitation that covers costs outside the scope of "section 1396d(a)(2)(C)" services is not, and cannot be used as, an offset to the State's

1    payment obligation. Likewise it is clear that the portion of NEMS-SFHP contract capitation that it

2    pays itself for FQHC services "furnished by" that center is and must be governed by the "not less

3    than" standard stated in clause (ix).

4

<center>**ACTUAL CONTROVERSY**</center>

5         88.     On or about May 2011, an Assistant United States Attorney from the Office of the

6    United States Attorney for the Northern District of California issued a Civil Investigative Demand

7    to NEMS to "determine whether there is or has been a violation of 31 U.S.C. § 3729" and

8    investigate "allegations that North East Medical Services submitted false or fraudulent

9    information to federal government healthcare programs." An agent from HHS OIG personally

10    served the CID on an officer of NEMS.

11         89.     The investigation launched or furthered by the CID is a joint effort of the United

12    States Attorney, HHS and the State of California in that the U.S. Attorney's Office has been

13    acting in concert with HHS (through an investigator in the HHS Office of Inspector General) and

14    the State (through its Attorney General's Office) with respect to *its* Medicaid program.

15         90.     Since July 2, 2011, NEMS has produced thousands of documents in response to

16    the CID and answered questions posed by the AUSA and representatives of defendants' (in *this*

17    case) concerning NEMS' operations as a managed care entity and Section 330 health center.

18         91.     At a meeting on or about November 9, 2011, NEMS (through counsel) met with

19    representatives of each such defendant (and the AUSA) to answer their questions and provide

20    information about NEMS' operations as a managed care entity and amounts reported through the

21    annual reconciliation process for purposes of offset against State FQHC special payment

22    obligation. Defendants (through their representatives) asked NEMS, as a follow up to the

23    meeting, to provide a written description of the payments that NEMS receives from SFHP that it

24    reports to the State for the purposes of an offset to the State's FQHC payment and to explain

25    NEMS' interpretation of the federal laws that govern the same.

26         92.     On or about January 20, 2012, NEMS provided defendants with a detailed

27    description of the monies it receives from SFHP and its reconciliation reporting for purposes of

28    the State's supplemental payment obligation. NEMS also provided reference to its position on the

<center>28</center>

federal laws that afford NEMS a right to be (and recognize its status as) a managed care entity and govern the amount that NEMS pay itself for its FQHC services to Medicaid beneficiaries/enrollees under its SFHP contract. A copy of this correspondence, dated January 20, 2012, is annexed hereto as Exhibit 1.

93.     During a conference call on or about February 9, 2012, the AUSA disclosed to NEMS for the first time that a *qui tam* action had been filed against NEMS in this district and that that the United States was considering whether to intervene. The HHS OIG investigator in the on that call acknowledged that a copy of the sealed complaint was shared with DHCS' representatives, but declined NEMS' request to review a copy of the same.

94.     On or about April 9, 2012, the AUSA expressly rejected the position stated in NEMS' January 20, 2012 letter and asserted contrary conclusions of law. While the AUSA's response uses uncertain language ("appears to violate" and "appears NEMS could be liable") on the issue of how much NEMS may owe under that case if its past conduct is held to be a violation of the False Claims Act, its conclusions as to the governing provisions of law are unequivocal and threaten the future viability of NEMS' entire operation. A copy of the AUSA's letter is annexed hereto as Exhibit 2. In particular, the letter asserts that the provisions in "section 1903(m)(2)(A)(ix) do not apply to NEMS" because NEMS does not have a MCO contract. In the alternative, it asserts that, even if clause (ix) were to apply to NEMS, it would require NEMS to pay itself more than what the result would be under the literal meaning of clause (ix)'s "not less than" payment requirement.

95.     On or about April 12, NEMS' counsel advised the AUSA that NEMS disagrees with the positions expressed in her April 9, 2012 letter, and that NEMS had no offer of settlement to propose.

96.     On or about May 7, 2012, the HHS OIG Investigator served a subpoena *duces tecum* on Patel and Associates, NEMS' auditors, for documents and records related to, among other things, "NEMS's reporting (or non-reporting) of revenue received from SFHP to any agency of the State of California," to be produced "in connection with an investigation relating to the submission of false claims to title XIX (Medicaid) of the Social Security Act."

1    97.    On or about May 8, 2012, the AUSA requested information from NEMS

2  concerning the manner in which NEMS is (and has been) paying itself for the laboratory,

3  radiology, and specialty services that it provides under the SFHP contract. In response, NEMS'

4  counsel inquired as to whether, by pursuing this question and seeking this particular information,

5  NEMS could infer that HHS had reconsidered the position expressed in the April 9, 2012 letter,

6  as that position would render a response to the question irrelevant and unnecessary. If NEMS

7  were to do what the AUSA's April 9, 2012 letter indicates, it would report the entire Medicaid

8  capitation it receives under its SFHP contract as an offset to wraparound. Whatever it paid itself

9  for laboratory, radiology, and specialty services would be subsumed in the amount so reported.

10    98.    On or about May 9, 2012, the AUSA reinforced the finality of the legal

11  conclusions she expressed on behalf of HHS and the California MFCU. In particular, she stated

12  that "[w]e have not changed our position" and, at the same time, insisted that NEMS is "obligated

13  to comply with the CID, irrespective of [its] opinions."

14    99.    NEMS reconciliation report for fiscal year 2011 (for purposes of the FQHC

15  payment offset) was due on May 31, 2012. NEMS timely submitted its report, along with copies

16  of Exhibits 1 and 2 of this complaint, in a manner that reports only the SFHP payments it received

17  for the primary and ambulatory care services it provided to SFHP enrollees. The legal premise of

18  the report is that clause (ix) determines the amount of payments the report must show. This case,

19  NEMS' counsel's letter to the AUSA on NEMS' legal position as to receipts that offset this

20  State's FQHC payment and the AUSA's response are combined with the legal position NEMS

21  has taken as to what amount *vis-à-vis* those receipts constitutes the FQHC payment offset.

22  Whether NEMS has paid or reported sums equaling that amount or more or less (and is owed or

23  owes the difference) is not an issue in this case.

### Harm to NEMS

25    100.    The harm or hardship that makes this dispute ripe for review is not that NEMS

26  faces a *qui tam* action or the prospect of having to defend itself against some other enforcement

27  action, should the state and/or federal government decide to pursue such actions, but rather the

28  compliance dilemma it faces as a result of an AUSA's letter purporting to give an authoritative

1  interpretation of statutory and regulatory provisions that have a direct, immediate, and harmful

2  effect on NEMS' current and future operations.

3      101.    That interpretation constitutes a sufficiently final agency action to be judicially

4  reviewable in this court, especially because the AUSA's letter by all appearances and on

5  information and belief expresses HHS' current view of whether and/or how clause (ix) applies to

6  NEMS' SFHP contract.

7      102.    That current HHS view constitutes a significant departure from, if not a reversal

8  of, the agency's longstanding views as to the meaning and effect of Medicaid law, including

9  clause (ix)'s application and meaning, on FQHC payment and managed care participation.

10      103.    For example, in 1998, CMS (then the Health Care Financing Administration)

11  issued two guidance letters to State Medicaid Directors ("the 1998 SMDLs") advising states on

12  CMS' interpretation of the FQHC payment provisions in the 1997 BBA and, in particular, that

13  law's change to the prior clause (ix).

14      104.    In one of the 1998 SMDLs, CMS states that: "Section 4712(b)(2) [i.e., clause (ix)]

15  requires that rates of payment between FQHCs/RHCs and MCOs shall not be less than the

16  amount of payment for a similar set of services with a non-FQHC/RHC. The intention of this

17  provision is to ensure that managed care entities negotiate rates of payment with FQHCs and

18  RHCs that are comparable to the rates paid to similar providers that do not have an FQHC or

19  RHC designation and thereby protects the State against negotiated rates that are excessively low

20  in comparison to the community standard."

21      105.    CMS views clause (ix) as a "prohibition of requirement for higher payments by

22  MCOs," that precludes a state from "impos[ing] any requirement on MCOs for payments to

23  FQHCs/RHCs other than those contained in 4712(b)(2) [i.e., clause (ix)]." (emphasis added). In

24  addition, CMS expressly stated that the intent of its policy on clause (ix) is "to not have the MCO

25  involved in any issues regarding supplemental payments, reconciliation or any other

26  reimbursement issue that would raise payment levels between the two parties above those of non-

27  FQHCs/RHCs that provide a similar set of services." (Emphasis added).

28      106.    About three years after the 1998 SMDL letters, CMS amended its Medicaid

1  managed care regulations to implement provisions of BBA 1997. In a preamble to those

2  amendments, CMS stated that clause (ix) not only flows through from prime to sub-managed care

3  contractors (like NEMS), but also that there was no need to promulgate a regulation to implement

4  clause (ix) because it is "straightforward and self-implementing." CMS (then-HCFA) also

5  stressed that it had already made known its interpretation of clause (ix) and "provided guidance to

6  all States, through [the 1998 SMDLs] on FQHCs," which are also "enforceable, and entitled to

7  deference from courts." In this connection, it is noteworthy that despite having indicated that it

8  would promulgate regulations on Medicaid FQHC payments, Medicare Program; Payment for

9  Federally Qualified Health Center Services, 57 Fed. Reg. 24961, 24868 (June 12, 1992), CMS

10 never did so and, instead, established a pattern and practice of issuing the functional equivalent of

11 FQHC payment rules through guidance documents, such as the SMDLs and letters to Regional

12 Offices of CMS.

13     107.  The AUSA's letter advances a novel reading of clause (ix) – i.e., that it is a floor,

14 not a ceiling, and "only requires that the payment be 'not less than' the amount paid to other

15 providers" – and, taking that reading to the extreme, asserts that NEMS "knowingly under-

16 reported" the amount it should have because the amount NEMS reported was premised on "not

17 less than" meaning what the words say and CMS confirmed in stating that clause (ix) "is straight-

18 forward and self-implementing," and, as such, no regulation as to that clause was necessary. The

19 AUSA's letter fails to acknowledge, much less confront, CMS's former views.

20     108.  Perhaps even worse, the amount of under reporting reflected in the AUSA's letter

21 is the trebled difference between what NEMS paid itself for FQHC services and the entire

22 capitation NEMS received under its SFHP contract, which covered health services and activities

23 NEMS as care provider did not even perform and also were other than the FQHC services

24 covered by the special FQHC payment requirement that triggers the reconciliation in the first

25 instance.

26     109.  Until NEMS obtains a declaration of its right to continue to report only the portion

27 of the capitation that covers the cost of the FQHC services that NEMS itself provides, as

28 determined by clause (ix)'s pay "not less than" rule, NEMS has no choice but to disclose to the

1  State in its reconciliation report and otherwise (and to federal officials to whom it reports on its
2  Section 330 grant and other federal funds it receives) to its detriment, the positions expressed in
3  the AUSA's letter.

4      110.   If NEMS had to report the full amount of the Medi-Cal capitation it receives from
5  SFHP on its annual reconciliation reports, it would by any reasonable estimate completely or very
6  nearly eliminate NEMS' receipt of *any* FQHC Medicaid payments.

7      111.   If NEMS continues to perform its managed care activities and reconciliation
8  reporting as it has, it will be doing so despite an express written notice by an apparently
9  authorized representation of the federal government that its legal rationale for its method of
10 reconciliation reporting is not only incorrect, but false, and results in an overpayment to NEMS.
11 Based merely on the fact that the AUSA and HHS OIG have been coordinating their efforts with
12 the State Medicaid program, and have shared their legal conclusions with State enforcement
13 officials (who have a duty to implement and adhere to the requirements of the Medicaid
14 program), the State will almost undoubtedly advance the AUSA letter's positions as an
15 administrative or state false claims action. These claims grow every single day NEMS continues
16 to perform the activities.

17     112.   The effect of the AUSA's letter, therefore, is direct and immediate and, as a result,
18 NEMS has a well-founded fear that the state and/or federal government will enforce the positions
19 and interpretations stated therein against NEMS retroactively and prospectively through legal
20 channels other than the federal False Claims Act. Such a well-founded fear also exists because of
21 what is described below.

22     **Violation of Section 330 of the PHS Act 330 and Section 1902(bb) of the SSA**

23     113.   Section 330 forbids its grantees from accepting Medicaid program payments for
24 services to Medicaid program beneficiaries that are less than the particular grantee's cost of
25 providing such services. Section 330, in a parallel provision forbids its grantees from taking
26 capitated contracts (such as NEMS' SFHP contract) if the capitation turns out to be less than the
27 grantees' costs of services under those contracts. Only recently, a senior official of HRSA (the
28 HHS division whose central office is responsible for the Section 330 grant program) reminded

1   certain grantees that if the capitated Medicaid contracts they were receiving wound up paying
2   them less than their full FQHC per visit payment their acceptance of such contracts could
3   jeopardize their receipt of further Section 330 grants.

4       114.   The positions taken in the AUSA letter do not affect just NEMS.  Even if NEMS
5   acted only as a service provider in contracting with SFHP, its FQHC per visit rate payment would
6   be dependent on SFHP's clause (ix) payment responsibility (to all FQHCs, not just NEMS).  If
7   clause (ix) means what the AUSA's letter says, the payments the SFHP must make to FQHCs for
8   their health services would have to be more than equal to the amounts it pays other providers than
9   FQHCs and could be substantially more.

10                        **FIRST CLAIM FOR RELIEF**

11      115.   Pursuant to the jurisdictional and cause of action statements set forth above, as
12  well as in paragraphs below, this claim and others that follow are as described in those
13  paragraphs.

14      116.   A case of actual controversy within the jurisdiction of this Court exists as to
15  whether (a) NEMS has a right to be and participate in Medicaid managed care as a MCO or its
16  equivalent; and (b) the requirement of clause (ix) determines that the portion of the Medi-Cal
17  capitation that MCOs must pay NEMS (and other) FQHCs and NEMS must pay itself under its
18  SFHP contract for the FQHC services it provides to Medicaid beneficiaries.

19      117.   The legal conclusions expressed in the AUSA letter, which specifically targets
20  NEMS, not only place into question NEMS' rights and liabilities with respect to past years, but
21  also threaten and completely undermine NEMS' entire operation and ability to function on a
22  going-forward basis.

23      118.   The legal conclusions expressed in the AUSA's letter and with HHS' support are:

24      (a)    facially invalid;

25      (b)    arbitrary and capricious, and contrary to law;

26      (c)    a change in longstanding HHS interpretations and policies on the reimbursement
27  rights of Section 330 FQHCs that is unjustified in any rule-making record, reasoned analysis,
28  or otherwise;

1    (d)    an improper and unauthorized manner of making a rule as the conclusions have a

2  direct and significant effect on the substantive federal rights of the NEMS and other similarly

3  situated health centers; and

4    (e)    not within the authority of the United States Attorney or the Justice Department to

5  make because rulemaking under the Social Security Act, of which the Medicaid Act and the

6  program it authorizes is a part (Title XIX), is for Medicaid, delegated to the Secretary of HHS

7  and delegable by the Secretary only to officials or divisions of HHS.

8  ### SECOND CLAIM FOR RELIEF

9  ### Violations of Federal Prospective Payment System

10  ### Failure to Make Fully Compensatory and Timely Payments

11    119.    A State Medicaid plan must pay the FQHC its per visit rate for covered services it

12  furnishes, regardless of where it furnishes them. 42 U.S.C. § 1396a(bb)(2). The limitations that

13  defendants place on FQHC payments under managed care through the AUSA's letter and their

14  consent to or complicity therewith (as further described below) cause FQHC payments for NEMS

15  and other FQHCs to be less than required. Other state limits have the same result. For example,

16  state limits on FQHC offsite services are contrary to federal law, limit reimbursement to which

17  FQHCs are entitled, and restrict their ability to provide services to which beneficiaries have a

18  right to receive.

19    120.    Section 1396a(bb)(5) of Title 42 unambiguously sets forth the requirements for

20  supplemental payments to FQHCs:

21          In the case of services furnished by a Federally-qualified health center .
22          . . pursuant to a contract between the center and a managed care entity,
            . . . the State plan shall provide for payment to the center or clinic by
23          the State of a supplemental payment equal to the amount (if any) by
            which the [statutorily-required per-visit rate] exceeds the amount of the
24          payments provided under the contract.

25

26  42 U.S.C. § 1396a(bb)(5)(A). These supplemental payments "shall be made . . . *in no case less*

27  *frequently than every 4 months.*" *Id.* at § 1396a(bb)(5)(B) (emphasis added). They in fact are later

28  made because the payments are actually and only made after an FQHC has submitted a

reconciliation report that reconciles the State's advance payments to the FQHC against actual amounts owed (as determined by the FQHC's report), offsetting payments from MCOs, and payments received from third parties for the same FQHC services for which the State has special payment responsibility.

121. DHCS has, in another proceedings, advanced a theory consistent with the position expressed in the AUSA letter and supported that position in the investigation of NEMS. NEMS, therefore, has every reason to expect DHCS to advance the positions stated in the AUSA's letter against it at least through the Medicaid reconciliation process for fiscal year 2011 and thereafter.

122. In the past, even without relying on the position expressed in the AUSA letter, DHCS has also continuously and consistently failed to make fully compensatory supplemental payments on the schedule (no less frequently than every 4 months) required by 42 U.S.C. § 1396a(bb)(5).

123. Compliance with 42 U.S.C. § 1396a(bb) entails not only the proper calculation of the supplemental amount to be paid to each health center but also the actual payment of appropriate amounts due in accordance with the timetable federal law prescribes. If, and to the extent the State of California's Medicaid program continues to pay FQHCs through a reconciliation that exceeds the statutorily required time of four months and, as reasonably expected, threatened, and advanced in a similar situation involving another Section 330 health center, DHCS advances the position expressed in the AUSA letter, it will deprive NEMS of its right to full and timely reimbursement.

## THIRD CLAIM FOR RELIEF

124. Defendants' theory of liability, as printed in the AUSA letter, conflicts with the plain language of the Medicaid statute and federal regulations in numerous respects.

125. The interpretation of law on which defendants' threatened legal action rests is contradicted by the plain language of the Medicaid statute and inconsistent with prior interpretations and directives issued by authorized HHS officials.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    126.    The interpretation of law on which defendants' threatened legal action rests would,

2    if successful, deprive NEMS of rights secured by the Constitution, Social Security Act, and laws

3    of the United States in violation of 42 U.S.C. § 1983.

4                                **PRAYER FOR RELIEF**

5            WHEREFORE, plaintiff NEMS asks this Court to enter an order:

6            127.    Declaring that the legal conclusions and positions (including that of the relator in

7    the above-described *qui tam* action) expressed in the AUSA's letter are unsupported by any

8    (properly promulgated) rule or regulation, are a departure from existing policy on the substantive

9    rights of Section 330 health centers, and contrary to law.

10           128.    Declaring that NEMS is eligible to operate as a Medicaid managed care

11   organization or its equivalent, under 42 U.S.C. § 1396b(m) and implementing regulations.

12           129.    Declaring that the payments that must be made by a state Medicaid program to a

13   Section 330 health center under 42 U.S.C. § 1396a(a)(15) for services described in §

14   1396d(a)(2)(C) in accordance with 42 U.S.C. § 1396a(bb) may be reduced only by the amount a

15   center receives from a managed care contractor or subcontractor for providing those specific

16   services (*i.e.*, those described in § 1396d(a)(2)(C)).

17           130.    Declaring that the "not less than" standard in 42 U.S.C. § 1396b(m)(2)(A)(ix)

18   governs the amount that NEMS, operating as a managed care organization, entity, or its

19   equivalent, must pay itself for the services described in § 1396d(a)(2)(C) that NEMS itself

20   provides, and that the meaning of "not less than" for Medicaid managed care contractors and

21   subcontractors paying Section 330 health centers such as NEMS and other entities qualifying as

22   FQHCs is that if the amount they pay for the services described in § 1396d(a)(2)(C) is equal to

23   the amount paid to other than entities defined as FQHCs for the same services, the payment fully

24   satisfies the clause (ix) requirement.

25           131.    Declaring that DHCS' failure to ensure that NEMS receives payment in the time

26   and amount as required by the Medicaid statute violates the State and federal defendants' duties

27   under that statute; and directing defendants, within no more than 45 days from the date of the

28   Court's Order, to submit a plan of action to the Court to implement a payment system (including

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    past and future payments) toward NEMS that is compliant with federal law, for the Court's

2    approval, and to NEMS, with time to file comments or objections to the Court, and the Court, as

3    it may deem necessary or appropriate, to hold a hearing or allow NEMS discovery to ensure that

4    it has adequate information on which to base comments or objections, and that any differences are

5    properly resolved by the Court;

6        132.    Retaining jurisdiction over this action to ensure that defendants fulfill all of the

7    requirements of any of this Court's Orders;

8        133.    Ordering defendants to reimburse plaintiff its reasonable attorneys' fees and costs

9    in bringing this case; and

10       134.    Providing such other and further relief as the Court deems warranted or just.

11

12    Dated: San Francisco, California

13    Dated: June 4, 2012                  LAW OFFICES OF ROBERT F. KANE

14

15                                  *Attorneys for Plaintiff*

                                   *North East Medical Services, Inc.*

16

17                                  By

                                     ROBERT F. KANE

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF



**FELDESMAN
TUCKER
LEIFER
FIDELL** LLP

JAMES L. FELDESMAN
JFeldesmanl@ftlf.com

January 20, 2012

*DELIVERY VIA E-MAIL*

Ila C. Deiss
Assistant United States Attorney
U.S. Department of Justice
450 Golden Gate Avenue, 9th Floor, Box 36055
San Francisco, California 94102-3495

*Re: Statutory Explanation of FQHC Acceptance of Risk as Managed Care Contractor*

Dear Ms. Deiss:

  As a follow-up to our November 9, 2011 meeting, this letter describes what federal law requires NEMS to pay itself for its medical services to Medicaid beneficiaries/enrollees under its San Francisco Health Plan ("SFHP") contract.

  Our description proceeds from the fact that NEMS' SFHP contract pays NEMS a capitated rate for the services and activities the contract covers, and that the contract between NEMS and SFHP is not a contract for NEMS' medical services. While those services are certainly a part of what that contract requires, the duties and responsibilities the contract imposes are those of a Medicaid managed care contractor – what Medicaid managed care regulations (at 42 C.F.R. Part 438) define as a "*Comprehensive Risk Contract*" (Italics in original) (§438.2). NEMS' SFHP "contract" for purposes of Part 438 is actually a "subcontract" under SFHP's prime comprehensive risk contract with the State's Medicaid program, administered by the Department of Health Care Services ("DHCS")).

1129 20th Street, NW
4th Floor
Washington, DC 20036
tel 202.466.8960
fax 202.293.8103
www.FTLF.com



FELDESMAN
TUCKER
LEIFER
FIDELL LLP

Ila C. Deiss
January 20, 2012
Page 2 of 4

Under §438.6(l), the NEMS subcontract "must fulfill the requirements of this part [438] that are appropriate to the service or activity delegated under the subcontract." NEMS' "comprehensive risk" subcontract includes delegations of the responsibilities SFHP assumes under its State contract for the area and SFHP Medicaid enrollees (in that area). Those responsibilities include managing the care beneficiaries receive, accepting the risk that capitation payments by their very nature impose, and making the array of Medicaid-covered services available to its area's Medicaid population.

In actuality, the "requirements of this part that are appropriate to the service or activity delegated" to NEMS are the same (or virtually the same) as those SFHP accepted in its contract with the State. As such, NEMS must be an entity that is eligible for a comprehensive risk contract (as set forth in §438.6(b)), must receive capitation payments that would meet the requirements of §438.6(c), and must meet other contract or contractor requirements under Part 438 that would apply to comprehensive risk contracts and the contractors that receive such contracts.

In this regard, NEMS' is indisputably eligible to receive a managed care contract under §438.6(b). The first three types of entities listed as eligible for a managed care contract in that section include: (1) a managed care organization ("MCO"); (2) entities identified in 42 U.S.C. §1396b(m)(2)(B)(i)-(iii); and (3) certain "Health Centers identified in §1396b(m)(2)(G)." NEMS qualifies as an MCO by virtue of §§ 1396b(m)(1)(A) and (C)(ii)(IV). NEMS may also qualify as an entity identified in §1396b(m)(2)(B) based on its responsibilities under its SFHP subcontract and its initial receipt of funding under prior versions of today's Section 330 of the Public Health Service Act, 42 U.S.C. § 254b) in (we are told) 1970. Finally, NEMS qualifies as an entity under §1396b(m)(2)(G) because

FELDESMAN
TUCKER
LEIFER
FIDELL LLP

Ila C. Deiss
January 20, 2012
Page 3 of 4

it is a current Section 330 grantee whose grant is well in excess of $100,000, and it has received such grants continuously for approximately 40 years.

All categories of entities eligible for Medicaid managed care contracts under 42 U.S.C. §1396b(m) (except entities under §1396b(m)(2)(B)) must be given contracts that conform to the requirements set forth in §1396b(m)(2)(A)(i) through (xiii) (but §1396b(m)(2)(G) entities need not be MCOs under clause (i)). All entities eligible for a managed care contract under §1396b(m)(2)(B) (including those that receive a "total exemption" from those (m)(2)(A) requirements (as noted in 42 C.F.R. §438.6(b)(3)), must be given contracts that comply with (m)(2)(A)(ix). Clause (ix) establishes the amount managed care contractors are required to pay FQHCs for the medical services the FQHCs provide to Medicaid beneficiaries ("not less than the level and amount" the contractor pays for the same "services if the services were furnished by a provider" other than an FQHC).

As such, what NEMS must pay itself for its medical services to Medicaid beneficiaries that are SFHP enrollees is what clause (ix) requires. Any remainder of its SFHP contract's capitation is available to cover all other costs entailed in carrying out the various responsibilities delegated to NEMS under the SFHP contract (*e.g.* provision of services other than those NEMS does itself, management and coordination (and record-keeping and reporting) of care, and acceptance of risk).

FELDESMAN
TUCKER
LEIFER
FIDELL LLP

Ila C. Deiss
January 20, 2012
Page 4 of 4

Please advise if you have any questions concerning the above.

Sincerely,
Feldesman Tucker Leifer Fidell LLP

/s/
James L. Feldesman
Matthew S. Freedus



U.S. Department of Justice

*United States Attorney*
*Northern District of California*

| | |
|---|---|
| *9th Floor, Federal Building* | *(415) 436-7124* |
| *450 Golden Gate Avenue, Box 36055* | |
| *San Francisco, California 94102* | *FAX:(415) 436-7169* |

via electronic mail
and first class mail

April 9, 2012

Matthew Freedus
Feldesman Tucker Leifer Fidell LLP
1129 20th Street, NW, 4th floor
Washington, DC 20036

Re:     **North East Medical Services (NEMS)**
        **FOR SETTLEMENT PURPOSES ONLY – SUBJECT TO FED. R. EVID. 408**

Dear Mr. Freedus:

In your letter of January 20th, 2012, you argue that (1) NEMS is subject to the provisions of 42 U.S.C. § 1903(m)(2)(A)(ix) governing payments by Managed Care Organizations (MCOs) to Federally-Qualified Health Centers (FQHCs), and (2) these provisions would require that NEMS report payments for medical services under its contract with the San Francisco Health Plan (SFHP) in the manner it does. For the reasons set forth below, both assertions are incorrect.

First, the provisions in section 1903(m)(2)(A)(ix) do not apply to NEMS. NEMS never contracted as an MCO. Rather, SFHP contracted as an MCO, and NEMS is serving as a subcontractor of SFHP. As a subcontractor, NEMS must fulfill requirements in part 438 that are "appropriate" to the "service or activity" being delegated to NEMS. 42 C.F.R. § 438.6(l). However, the requirements in section 1903(m)(2)(A)(ix) are not "appropriate" to apply to a subcontractor. Rather, by definition, these requirements govern payments made by an MCO *to* a subcontracting FQHC – not payments made *by* a subcontracting FQHC to itself or another entity. Thus, while the requirements in section 1903(m)(2)(A)(ix) would apply to SFHP's payments *to* NEMS, they do not apply to payments *by* NEMS to "itself" or another entity.

Secondly, even if the requirements in section 1903(m)(2)(A)(ix) did apply to payments by NEMS to "itself" for medical services, these requirements would not preclude the payment from being a higher amount than that paid by NEMS to other providers. Section 1903(m)(2)(A)(ix) only requires that payment be "not less than" the amount paid to other providers. Hence, it would be improper to cite this provision as requiring a particularly low payment amount.

More importantly to our investigation, FQHCs such as NEMS are required to submit an annual reconciliation report to reconcile the payment amounts they have received and the

EXHIBIT 2

per-visit FQHC payment amount they are entitled to receive under the Statute. For payments that an FQHC receives from a managed care organization, the statute provides:

> In the case of services furnished by a Federally-qualified health center ... pursuant to a contract between the center and a managed care entity, ... the State plan shall provide for payment to the center or clinic by the State of a supplemental payment equal to the amount (if any) by which the [statutorily required per-visit rate] exceeds the amount of the payments provided under the contract.

42 U.S.C. § 1396a(bb)(5)(A). Where an FQHC receives less than the amount calculated under the per-visit formula, Medicaid, in California known as Medi-Cal, pays the FQHCs a supplemental or "wraparound" payment to make up for the difference. Id. § 1396a(bb)(5)(A).

From at least 2005 to 2010, NEMS knowingly under-reported the money it received from SFHP for Medicaid patients and this appears to violate the False Claims Act (FCA), 31 U.S.C. §§ 3729-33.

| Year | Paid Amount | Amount on Reconciliation Report | Difference |
|------|------------|--------------------------------|-----------|
| 2005 | $3,915,650.68 | $1,951,057.00 | $1,964,593.68 |
| 2006 | $4,713,426.61 | $2,070,933.00 | $2,642,493.61 |
| 2007 | $4,813,398.76 | $2,037,708.00 | $2,775,690.76 |
| 2008 | $4,446,317.02 | $2,374,974.00 | $2,071,343.02 |
| 2009 | $4,719,546.39 | $2,154,172.00 | $2,565,374.39 |
| 2010 | $5,152,454.33 | $2,266,486.00 | $2,885,968.33 |
| Total | $27,760,793.79 | $12,855,330.00 | $14,905,463.79 |

This seems to indicate that for those five years at least, NEMS received over $27 million from the SFHP for Medi-Cal beneficiaries, but knowingly reported receiving only approximately $13 million from all Medicaid managed care plans, resulting in nearly $15 in Medi-Cal reconciliation settlement overpayments. It appears NEMS could be liable under the False Claims Act for three times this amount, or $44,716,391, plus civil penalties. This supports the allegations made in the *qui tam* filed in this District. Our intervention deadline is **July 2, 2012.** Contact me by April 23, 2012, if you wish to discuss this.

Sincerely,

Ila Deiss
Assistant U.S. Attorney

cc Edward Crooke, DOJ